UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

ESTATE OF WILLIAM A. STEWART, JR.,    Case No.: 10 CIV. 2632 (LTS)
                                      ECF Case

                    Plaintiffs,

        -against-

SUGAR HILL MUSIC PUBLISHING,
LTD., DIAMOND HEAD MUSIC,
INC. d/b/a TWENTY NINE BLACK
MUSIC, JOEY ROBINSON, SYLVIA
ROBINSON and LELAND ROBINSON,

                    Defendants.

---------------------------------------------------------X

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

                        CINQUE & CINQUE, P. C.
                        Attorneys for Defendants
                        845 Third Avenue, Suite 1400
                        New York, New York 10022
                        Telephone: (212) 759-5515
                        Telefax:    (212) 759-7737
                        Email:      CINQUE845@aol.com

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| TABLE OF AUTHORITIES |  |  | iii |
| PRELIMINARY STATEMENT |  |  | 1 |
| STATEMENT OF FACTS |  |  | 2 |
| POINT I | - | PLAINTIFF IS NOT ENTITLED TO ANY DAMAGES | 8 |
|  |  | (A) Almost All of the "No Diggity" Sales Occurred Before the Assignment |  |
|  |  | (B) Mr. Berger Ignores the Statute of Limitations | 11 |
|  |  | (C) Berger's Failure to Account for Monies Received by Stewart and His Estate | 13 |
|  |  | (D) The Improper Estimate of Sales Figures and Income | 15 |
| POINT II | - | THE ASSIGNMENT IS VALID | 17 |
|  |  | (A) The Assignment Does Not Have To Be Filed | 17 |
|  |  | (B) The Assignment Needs No Consideration | 18 |
|  |  | (C) The Assignment is Self-Authenticating | 19 |

i

                                                                    Page

POINT III     -     THE AGREEMENT IS ENFORCEABLE                      20

                    (A) Sugar Hill Did Not Have to Sign
                    the Agreement                                     20

                    (B) An Acknowledgment Of Consideration
                    Is Dispositive                                    21

POINT IV      -     THERE IS NO BASIS UPON WHICH TO
                    PIERCE THE CORPORATE VEIL OF
                    SUGAR HILL AND DIAMOND HEAD                       21

CONCLUSION                                                            24

# TABLE OF AUTHORITIES

<u>Case</u>                                                                                         <u>Page</u>

<u>Consarc Corp.</u> v. <u>Marine Midland Bank, N.A.</u>, 996 F. 2d 568
    (2nd Cir. 1993)                                                                   20

<u>Davin</u> v. <u>Isman</u>, 228 N.Y. 1 (1920)                                             19

<u>Jackson</u> v. <u>M'Chesney</u>, 7 Cow. 360 (1827)                             21

<u>Rudnick</u> v. <u>Fishbeck</u>, 158 F.2d 940, (2nd Cir. 1946), <u>cert. denied</u>,
    330 U.S. 851 (1947)                                                           18

<u>Sanders</u> v. <u>Soutter</u>, 136 N.Y. 97 (1812)                              19

<u>Tuff-N-Rumble Management, Inc.</u> v. <u>Sugarhill Music Publishing, Inc.</u>,
    2000 WL 274192 (S.D.N.Y.)                                            22

<u>Wm. Passalacqua Builders, Inc.</u> v. <u>Resnick Developers South, Inc.</u>,
    933 F.2d 131 (2nd Cir. 1991)                                          22, 23

<u>Authority</u>

17 U.S.C. §204(a)                                                                 18

17 U.S.C. §205                                                                    17

17 U.S.C. §205(c)                                                                 17

Federal Rule of Evidence 902(8)                                          19

New York General Obligations Law §5-1107                         18

CPLR §213                                                                         11

CPLR §213(2)                                                                      12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

ESTATE OF WILLIAM A. STEWART, JR.,    Case No.: 10 CIV. 2632 (LTS)
                                       ECF Case

                    Plaintiffs,

      -against-

SUGAR HILL MUSIC PUBLISHING,
LTD., DIAMOND HEAD MUSIC,
INC. d/b/a TWENTY NINE BLACK
MUSIC, JOEY ROBINSON, SYLVIA
ROBINSON and LELAND ROBINSON,

                    Defendants.

----------------------------------------------------------X

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

      This memorandum of points and authorities is submitted by defendants in

opposition to plaintiff's motion for summary judgment on both its claims for copyright

infringement (based upon the fact that there was no agreement between the parties) and

for claims based upon the existence of agreements between the parties (breach of contract

and rescission). As explained below, not only are these theories diametrically opposed on

the facts, but there is no basis in law to pursue any of them.

## STATEMENT OF FACTS

When plaintiff Stewart initially brought this action, it alleged that defendants infringed the copyright in "No Diggity" by exploiting it "without permission or authorization." Soon after the complaint was filed defendants provided Stewart with a copy of the Assignment annexed as Exhibit 1 to Joseph Robinson, Jr.'s declaration in opposition to the motion and made the original (which survived fire and water damage from a fire which destroyed the building housing Sugar Hill's offices) available for inspection. Plaintiff's response was to amend the complaint, not withdrawing the copyright infringement claim, but adding totally inconsistent claims for breach of contract and rescission (the contract being the Assignment and accompanying Agreement, Exhibit 2 to the Robinson declaration).

During the course of discovery plaintiff continued to maintain that there were no agreements between Stewart and defendants: no agreements were produced during discovery despite demand and plaintiff's representative testified that she was not aware of any agreements. At the conclusion of discovery, in anticipation of summary judgment motions, defendants served a brief set of contention interrogatories asking plaintiff whether it contended that Stewart did not sign either the Assignment or Agreement. When plaintiff refused to answer these yes or no questions, Magistrate Judge Cott directed such a response. Plaintiff then unequivocally stated its contention that Stewart did not sign either document, thereby admitting that there were no agreements between

2

plaintiff and defendants.

Despite this admission and others during the course of discovery, plaintiff nevertheless seeks summary judgment to enforce agreements whose existence has been denied. As explained below, plaintiff cannot assert claims arising out of contracts which it has admitted do not exist.

Even if plaintiff were permitted to assert these factually inconsistent claims at trial, they are not entitled to summary judgment for a number of reasons. Contract damages in excess of $300,000.00 are sought, based upon the unsubstantiated assumption that the "No Diggity" single sold 1,999,999 units and the "Another Level" album which contained "No Diggity" sold 4,999,999 units. These numbers are based upon the fact that the RIAA certified "No Diggity" as having 1,000,000 sales and "Another Level" having 4,000,000 sales. While documents admittedly exist in the possession of record companies which would show the exact number of units sold and when they were sold, plaintiff has ignored them. Most importantly, however, it is also uncontroverted that almost all of the "No Diggity" sales occurred years prior to the May 25, 1999 Assignment to Sugar Hill, and it is uncontroverted that payment for these sales would have been made to plaintiff long prior to the Assignment. The "No Diggity" single was certified as having had 1,000,000 sales by December 6, 1996. According to plaintiff's own expert monies due as a result of these sales would have been paid within one year: i.e., by December 6, 1997. Also, by plaintiff's expert's admission, Sugar Hill was not entitled to collect any "No Diggity"

3

income until it obtained the Assignment in May of 1999. Clearly, Sugar Hill did not and could not have collected this income. Similarly, the "Another Level" album sold 1,000,000 units by November 14, 1996 (so that payments would have been made by November 14, 1997); 3,000,000 units were sold by April 16, 1997 (so that royalties on the next 2,000,000 units would have been paid by April 16, 1998); and 4,000,000 units were sold by November 19, 1997 (so that royalties on the last 1,000,000 units would have been paid by November 19, 1998). As income on all of these units would have been paid prior to the Assignment, there is no basis to impute Sugar Hill as having received this income, as set forth in the Berger report.

The Berger report and plaintiff's motion do not take into consideration whatsoever the fact that, under the terms of the Assignment (as admitted by plaintiff's expert), Sugar Hill was to receive all "No Diggity" income after May 25, 1999 and pay plaintiff 60% of it. Since the Assignment, plaintiff collected $103,168.98, without paying Sugar Hill anything. As plaintiff was only entitled to 60% of this amount, Sugar Hill is entitled to a $41,267.59 credit against any monies which it might owe to plaintiff.

The "No Diggity" Assignment was obtained by Sugar Hill's representative Joseph Robinson, Sr., who passed away in 2001. His son, Joseph Robinson, Jr., then took over administration of the Sugar Hill catalog and was unaware of the fact that "No Diggity" was included since the catalog contains hundreds of compositions and the income generated by "No Diggity" was not out of the ordinary. Sugar Hill only registered its

4

rights with certain sub-publishers in certain territories outside of the United States. The gross income received by Sugar Hill with respect to "No Diggity" over the last six years (as far back as Sugar Hill keeps royalty statements) was $30,532.88, 60% of which was due plaintiff, less the $2,500.00 advance paid upon execution of the Agreement and $41,267.59 credit due Sugar Hill. Therefore, under the terms of the Assignment and Agreement, not only does Sugar Hill owe no money to plaintiff, but in fact plaintiff owes Sugar Hill $25,447.86.

Sugar Hill produced all of the agreements and royalty statements received from its sub-publishers abroad. Plaintiff was unable through discovery from third parties to locate a single statement which was sent to defendants which they did not produce. Nevertheless, plaintiff argues that Sugar Hill received additional income. One of the alleged sources of income was foreign performance income. However, not only did Sugar Hill categorically deny receiving such income and plaintiff cannot cite a single document to refute this, but in fact the foreign performance income was paid to plaintiff by BMI, as evidenced by the BMI royalty statements sent to plaintiff. In addition, plaintiff seeks damages of approximately $10,000.00 based upon "unreported and under-reported income" which plaintiff's expert admitted was never received by Sugar Hill: it is only a claim that Sugar Hill should have received more money from its sub-publishers since sub-publishers do not properly account as a general rule. This claim is totally without basis.

5

Plaintiff's damages computation is also based upon the unsubstantiated assumption that sales in foreign territories are equal to sales in the United States. Although plaintiff admitted that documents exist that would show what these foreign sales were in the limited territories in which Sugar Hill's sub-publishers collected, no such attempt was made by plaintiff to obtain these documents. Furthermore, plaintiff's damages computation ignores the six-year statute of limitations and seeks money going back to "inception" of the composition, which was in 1996. Not only does this run afoul of the statute of limitations but, as explained above. it also ignores the fact that Sugar Hill did not obtain any rights in the composition until May 25, 1999 and therefore could not possibly be responsible for income collected prior to that date.

With respect to the copyright infringement claim, it is totally refuted by the terms of the Assignment of copyright signed by Stewart before a notary public, who testified that he witnessed Mr. Stewart's signature on May 25, 1999. There is no requirement that the Assignment be filed with the Copyright Office in order to be effective, as admitted by plaintiff's expert and as set forth in the Copyright Act. In addition, there is no requirement that the Assignment be signed by the assignee (although Joseph Robinson, Jr. stated that his father's custom was to have two original copies, with each party getting the other's original signature). Sugar Hill's possession of the original Assignment is additional evidence that it was executed by Stewart. The Assignment was accompanied by an Agreement signed by Stewart and Lavaba Mallison, who has submitted a

6

declaration stating that Mr. Stewart executed the document on May 25, 1999 and forgot to change the 1998 date on the first line. Mr. Mallison confirmed that Mr. Stewart received the $2,500.00 check upon execution of the Agreement, as recited therein. Although Sugar Hill was not able to obtain a copy of the cancelled check since it was written some twelve years ago and Sugar Hill's bank does not maintain records going back that far, Mr. Mallison has confirmed its payment, the document contains an acknowledgment of its receipt, and plaintiff has not offered any evidence whatsoever that it was not received. Plaintiff has not challenged the authenticity of the Assignment and Agreement through any expert report or testimony, even though the originals are available for testing. In addition, the copyright infringement claim has no basis in law since Sugar Hill never received any income whatsoever with respect to exploitation of "No Diggity" within the United States and the Copyright Act has no extra-territorial effect. Sugar Hill's sub-publishers are located abroad and only collected income abroad. The mere fact that Sugar Hill might have entered into agreements with these foreign sub-publishers does not support the exercise of Copyright Act jurisdiction.

Plaintiff is not only not entitled to summary judgment on any of its claims, but in fact defendants are entitled to summary judgment for the reasons set forth in their motion for such relief.

7

## POINT I

### PLAINTIFF IS NOT ENTITLED TO ANY DAMAGES

The report of plaintiff's expert witness Jay Berger (Exhibit 5 to plaintiff's moving papers) and his November 18, 2011 declaration (Docket No. 70) do not support the requested claim of $266,618.22[1] for a number of reasons as explained in Mr. Berger's deposition (the "Berger Dep.," Exhibit A to the Cinque Reply Dec.) and below.

### (A)    Almost All of the "No Diggity" Sales Occurred Before the Assignment

In his report Mr. Berger attributes damages of $259,212.34 for royalties allegedly owed "from inception to 2003." The Assignment at issue was dated May 25, 1999 (Exhibit 1 to Joseph Robinson, Jr.'s November 15, 2011 declaration, Docket No. 63). Mr. Berger himself admitted that Sugar Hill would only have the right to collect income generated by "No Diggity" after the date of the Assignment:

> Q. Is it your understanding that documents numbered 1 and 2 in Exhibit 4, those two documents we looked at, what would be the effective date of that assignment, assuming that those are proper documents?
>
> A. Assuming the validity of the document, it would be May 25, '99.
>
> Q. And again, assuming the validity of those documents, would Sugar Hill have the right to collect money prior to May '99?

---

[1] The report lists damages at $317,106.77, but this amount was reduced in Mr. Berger's declaration.

8

A.  No, they would not.  (Berger Dep. pp. 42-43)

It is clear from Mr. Berger's report that almost all of the sales of "No Diggity" occurred prior to May 25, 1999.  Nevertheless his report seeks to charge Sugar Hill with income earned prior to May 25, 1999.

Mr. Berger admits at page 10 of his report (Exhibit 5 to plaintiff's motion) that the "Another Level" album which contained "No Diggity" as well as the "No Diggity" single were both released in 1996.  On page 11 of his report Mr. Berger states that:

> on November 19, 1997, the RIAA certified the album "Another Level" four (4) times "platinum," i.e., it sold more than 4 million units in the United States.

> \* \* \*

> Further, on December 6, 1996, the RIAA certified the single "No Diggity" "platinum," i.e., it sold more than 1 million units in the United States.

Mr. Berger then estimates that 4,999,999 units of the "Another Level" album and 1,999,999 units of the "No Diggity" single were sold.[2]

Mr. Berger testified that publishing income would be paid on sales of records within one year of their sale:

---

[2]  In his November 18, 2011 declaration, Mr. Berger lowers each of these unit amounts by 500,000.  As explained below, Mr. Berger never tried to ascertain actual sales figures available either through the record company or through Sound Scan.

9

Q.  So let's assume a record is released on January 1 of a certain year, the society will report income around September-ish?

A.  They will receive the money around September-ish.  But then depending upon their reporting schedule, it might not go out until like January or so.  It depends on when they receive the money with respect to when they normally send out their royalty reports and payments.

Q.  So again, approximately, it will be like a one-year lag between the date of a release and when a writer would receive money?

A.  Kind of.  Yes.  (Berger Dep., pp. 39-40).

* * *

Q.  And in the next paragraph, you go on to state that there were one million units sold by December '96; is that correct?  One million units of the single?

A.  That's correct, yes.

Q.  Again, the income on that would have been paid by the end of '97 in the ordinary course?

A.  Yes.  (Berger Dep. p. 49).

As 4 million units of "Another Level" were sold by November 19, 1997, income associated with sales of these 4 million units would have been paid by November 19, 1998 according to Mr. Berger's testimony.  These royalties would have been paid as sales were made.  As set forth in the RIAA database (Exhibit 3 to the Declaration of Joseph Robinson, Jr. in opposition to plaintiff's motion for summary judgment) "Another Level"

10

sold 1 million units by November 14, 1996, 3 million units by April 16, 1997 and 4 million units by November 19, 1997. Therefore, royalties on 1 million units would have been paid before November 14, 1997, royalties on the next 2 million units by April 16, 1998, and royalties on the last million units by November 19, 1998. As the "No Diggity" single was certified as having attained 1 million unit sales by December 6, 1996, these royalties would have been paid by December 6, 1997.

As the Assignment to Sugar Hill did not occur until May 25, 1999, and as admitted by Mr. Berger Sugar Hill did not have the right to collect royalties until then, Sugar Hill did not collect and cannot be liable for any damages based upon on sales prior to the Assignment. As virtually all of the sales of both the "Another Level" album and the "No Diggity" single occurred prior to May 25, 1999, the request for damages from inception is totally without foundation.

**(B)    Mr. Berger Ignores the Statute of Limitations**

In seeking damages from release of the record in 1996 plaintiff ignores the six year statute of limitations in CPLR §213.

Plaintiff impermissibly seeks damages accruing since the release of "No Diggity" in 1996, even though Sugar Hill's Assignment was in May of 1999 and it is undisputed that Sugar Hill did not have any right to collect income until it obtained the Assignment. Clearly, damages for the period prior to the Assignment are totally baseless.

In addition, plaintiff at best would be entitled to damages during the period six

11

years prior to the commencement of this action, pursuant to CPLR §213(2). Defendants have produced all royalty statements received during this period, showing that they received a total of $30,532.88 (see Cohen Dec., ¶ 4). During this same period, however, plaintiff received $103,168.98 in connection with "No Diggity" (¶ 4 of Cohen Dec.). Plaintiff's claim for damages is therefore improper since: (1) it seeks royalties for a period (inception to May 22, 1999) when Sugar Hill had no interest whatsoever in the copyright and was not authorized and did not collect any such income; (2) damages are not limited to monies received by Sugar Hill during the last six years; and (3) the calculation fails to take into account the fact that plaintiff collected over $100,000.00 which should have been paid to Sugar Hill.

Defendants produced all royalty statements they received with respect to "No Diggity" within the last six years. Mr. Berger's report states that Sugar Hill received approximately $15,000.00 from Warner Chappel during this period, and approximately $16,000.00 from IQ Music/Budde Music, Ltd. (Exhibit 5 to plaintiff's motion, pp. 9 and 10). Mr. Berger testified that he had no seen any documents other than those produced by Sugar Hill during discovery relating to any income which may have been received by Sugar Hill:

> Q. Do you have any knowledge one way or the other as to whether Sugar Hill received any income other than what was reflected in the statements that you reviewed?
>
> A. I have no knowledge. (Berger Dep. p. 59).

12

It is therefore uncontroverted that Sugar Hill received a grand total of approximately

$31,000.00 in connection with "No Diggity" within six years of the commencement of

this action. It is also admitted by Mr. Berger that, according to the Assignment and

Agreement, plaintiff would only be entitled to sixty (60%) percent of this amount:

> Q. And what document did you see?
>
> A. The first document, which has the handwritten date,
> appears that Sugar Hill is going to collect a hundred percent
> of income, whatever that income will be, and will distribute it
> 20 percent to Sugar Hill Music and 20 percent to Levaba
> Mallison, with the remaining 60 percent going to Mr. Stewart.
> (Berger Dep., p. 22).

**(C)   Berger's Failure to Account for
       Monies Received by Stewart and His Estate**

The Berger Report does not credit Sugar Hill with either the $2,500.00 advance

paid to Mr. Stewart upon execution of the Assignment and Agreement (Mallison Dec. and

Ex. 1 thereto) or the $103,168.98 which Stewart and his Estate received after May 25,

1999 (Cohen Dec. ¶ 4). Mr. Berger testified that he did not take into consideration any of

the monies received by Stewart or his Estate when computing damages:

> Did you become aware of the fact that Stewart collected any
> income in connection with the musical composition entitled
> "No Diggity"?
>
> A. Yes.
>
> * * *

13

> Q. Did you take that fact into consideration at all in
> connection with your report?
>
> A. No. (Berger Dep. pp. 12-13).

As explained at page 21 of defendants' memorandum of law in support of their motion

for summary judgment (and ignored by plaintiff), Sugar Hill is entitled to a credit for the

monies paid to Stewart and the improper collection of "No Diggity" money in violation of

the Assignment. Even Mr. Berger admitted that, under the terms of the Assignment,

Sugar Hill was to collect publishing income and then pay 60% of it to Mr. Stewart:

> Q. And assuming that it was, let's assume for purposes of
> this question that it should have been, going to page 1, they
> should have said dated -- and it is hard for me to read this
> upside down, but May 25, '99.
>
> A. Okay.
>
> Q. Let's just assume that it's supposed to reference this
> agreement. Then what would your opinion be as to what those
> two documents mean?
>
> MR. ADELMAN: Note my objection. You can answer.
>
> A. If this assignment is valid, in conjunction with this
> Agreement, Sugar Hill would collect a hundred percent of the
> composition royalties, and pay to Mr. Stewart 60 percent.
> (Berger Dep. pp. 24-25).

As plaintiff received income which should have been paid to Sugar Hill pursuant to the

terms of the Assignment, defendant may use this as an offset and credit.

14

**(D)** **The Improper Estimate of Sales Figures and Income**

Mr. Berger made three improper assumptions in computing sales figures for "No

Diggity," in addition to his improperly computing royalties from sales since 1996. First

he assumed that foreign sales (collected by Sugar Hill in some territories) were the same

as U.S. sales. Defendants' expert Gary Cohen disputes this (Cohen Dec. ¶ 9).

Second, Mr. Berger admits that there are in fact documents which would show

what Sugar Hill collected - documents he chose to ignore:

> Q. Your extrapolation would be unnecessary if we actually
> had UMG statements to the sub-publishers; is that correct?
>
> A. Absolutely.
>
> Q. And wouldn't you agree that would be the best way to
> determine what was paid in connection with this song; is to
> see what UMG paid the sub-publishers?
>
> A. And for what units they accounted for, correct. (Berger
> Dep. p. 57).
>
>                * * *
>
> Q. Well, would there be documents indicating how much
> Sugar Hill received?
>
> A. Sure.
>
> Q. And what documents would those be?
>
> A. Those would be documents from its sub-publishers and
> societies. Absolutely. (Berger Dep. p. 60).
>
>                * * *

15

> Q. What documents would exist to actually show what was
> received during that time period instead of making an
> extrapolation?
>
> A. You would have to get the royalty reports from inception
> through present. They would be the royalty reports from all
> the sub-publishers and UMG. (Berger Dep. pp. 71-72).

Mr. Berger did not consult these documents, which would show exactly what was paid,

and Sugar Hill has produced its documents showing gross collections of about

$30,000.00. If plaintiff believes that Sugar Hill collected more money than indicated by

its sub-publishers' statements, plaintiff should have supported its position with statements

sent by sub-publishers to Sugar Hill. The reason why this was not done is because Sugar

Hill produced all such statements and it did not collect any money other than that

indicated by these statements, and Mr. Berger did not see any such statements:

> Q. But do you have any information or documents to show
> that there was income received by Sugar Hill that was not
> reflected on the reports that you looked at?
>
> A. No, I do not. (Berger Dep. p. 35).

Third, Mr. Berger attributes $16,717.36 as having been received by Sugar Hill in

foreign performance income (Berger Report, p. 12). This money was actually received by

plaintiff and not Sugar Hill, as it is collected by a company called BMI, as admitted by

Mr. Berger:

> Q. And let's assume BMI is collecting worldwide on this

16

> song, just for purposes of this question:  Would BMI be
> receiving these foreign performing society statements?
>
> A.  For most of them, yes. (Berger Dep., p. 63).

The BMI royalty statements are included among Exhibit B to the Cohen Declaration and

establish that the income was paid to plaintiff.

## POINT II

## THE ASSIGNMENT IS VALID

None of plaintiff's attacks on the validity of the Assignment has any merit.

**(A)   The Assignment Does Not Have To Be Filed**

Plaintiff argues that the Assignment is unenforceable since it was not filed with the

Copyright Office.  This argument overlooks the recordation provision of the Copyright

Act (17 U.S.C. §205), which is meant to provide notice of registration and rights, and

provides priority to the party who first records a transfer.  Nothing in this statute requires

that transfer documents be filed in order to be effective, as "recordation of a document in

the Copyright Office gives all persons constructive notice of the facts stated in the

recorded document."  17 U.S.C. §205(c).

Even Mr. Berger admits that there is no filing requirement:

> Q.  Is it your understanding that an assignment of a copyright
> must be filed in the Copyright Office in order to be valid?
>
> A.  It does not -- there is no requirement that it be filed.
>
> Q.  Similarly, on the top of the next page, you talk about it

17

> being registered with BMI. Same question: Is it your
> understanding that an assignment is not valid if it's not filed
> with BMI?
>
> A. There is no requirement to be filed with BMI. (Berger
> Dep. p. 28).

## (B)   The Assignment Needs No Consideration

Defendants have in support of their summary judgment motion submitted the

affidavit of Lavaba Mallison, who testifies that Sugar Hill paid Stewart $2,500.00 when

he assigned the copyright to Sugar Hill. However, the validity of an assignment is not

dependent upon consideration, as set forth in New York General Obligations Law §5-

1107:

> An assignment shall not be denied the effect of
> irrevocably transferring the assignor's rights because of the
> absence of consideration, if such assignment is in writing and
> signed by the assignor, or by his agent.

As held in Rudnick v. Fishbeck, 158 F.2d 940, 942 (2nd Cir. 1946), cert. denied, 330 U.S.

851 (1947):

> The assignment needed no consideration; see New
> York Personal Property Law, Sec. 33, subdivision 4 [the
> predecessor to GOL §5-1107].

Similarly, under 17 U.S.C. §204(a) a transfer of copyright is valid if "in writing and

signed by the owner of the rights conveyed or such owner's duly authorized agent."

As no consideration for the assignment was necessary, the Assignment is

18

enforceable.  Furthermore, the fact that Sugar Hill is in possession of the original

Assignment signed by Mr. Stewart in 1999 is presumptive evidence that it was delivered

for valid consideration, as held in  Davin v. Isman, 228 N.Y. 1, 7 (1920): "The possession

by defendant of the assignment thus prepared by Mr. Lilly is presumptive evidence of a

delivery of the instrument by him to defendant for a valid consideration."

As Mr. Stewart executed the Assignment it is valid even if not countersigned by

the assignee Sugar Hill[3] since the statute only requires that it be "signed by the assignor or

by his agent."  This is because an assignment is a conveyance of rights owned by the

assignor.  Sanders v. Soutter, 136 N.Y. 97, 99 (1812).

**(C)     The Assignment Is Self-Authenticating**

As the Assignment was witnessed by a Notary Public, it is self-authenticating

under Federal Rule of Evidence 902(8) and requires no evidence of authenticity in order

to be admissible:

> The following items of evidence are self-
> authenticating; they require no extrinsic evidence of
> authenticity in order to be admitted:
>
> **\* \* \***
>
> **(8) Acknowledged Documents.**  A document
> accompanied by a certificate of acknowledgment that is
> lawfully executed by a notary public or another officer who is
> authorized to take acknowledgments.

------------------------

[3]   Joey Robinson state that his father's custom was to have two original documents, each
party getting the other's original signature.

Plaintiff's argument that the Assignment is not authentic is therefore without support.

## POINT III

## THE AGREEMENT IS ENFORCEABLE

Plaintiff's arguments, that the Agreement is unenforceable because Sugar Hill did not produce a countersigned copy and evidence of payment of the advance, are both without foundation.

### (A)   Sugar Hill Did Not Have to Sign the Agreement

It is clear that contracts do not have to be signed in order to be valid.  <u>See</u>, <u>e.g.</u>:

<u>Consarc Corp.</u> v. <u>Marine Midland Bank, N.A.</u>, 996 F. 2d 568, 572-573 (2nd Cir. 1993):

> Relevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party. *Crabtree*, 305 N.Y. at 53-55, 110 N.E.2d 551; *Weiner & Co. v. Teitelbaum*, 107 A.D.2d 583, 584, 483 N.Y.S.2d 313 (1st Dep't 1985).

Here, the party to be charged (Stewart) signed the Agreement and Sugar Hill admits that it is a valid contract.

Even if Sugar Hill's signature was required, Lavaba Mallison (a signatory to the Agreement) states that it was signed by Sugar Hill and Joey Robinson has testified that it was his father's custom to have two original documents, each party getting the other's original signature.

20

**(B)**     **An Acknowledgment Of Consideration Is Dispositive**

In the Agreement signed by Stewart, he acknowledged that a $2,500.00 check was given to him as an advance against royalties. It has long been held that an acknowledgment of receit of money is competent evidence of its payment. See, e.g.: Jackson v. M'Chesney, 7 Cow. 360 (1827):

> The acknowledgment in a deed, of the receipt of the consideration money, is *prima facie* evidence of its payment. It is equivalent to, and like a receipt for money. It is liable to be explained or contradicted; but until impeached, it is legal and competent evidence of payment.

As Stewart acknowledged his receipt of the $2,500.00 check (payment of which was confirmed by the affidavit of Lavaba Mallison submitted by defendants) and as receipt of this check has not been impeached by the Stewart Estate, the acknowledgment constitutes conclusive evidence of payment.

<u>POINT IV</u>

**THERE IS NO BASIS UPON WHICH
TO PIERCE THE CORPORATE VEIL
<u>OF SUGAR HILL AND DIAMOND HEAD</u>**

The only fact established by defendants' answers to interrogatories (Exhibit 10 to the Adelman Dec.) is that Sugar Hill and Diamond Head (which are family owned

companies) have the same officers and shareholders (Sylvia Robinson[4] and her son

Joseph Robinson, Jr.). The fact that the corporate minute books of these companies were

not produced is easily explained by the fact that, as stated in defendants' response to

plaintiff's document request (Exhibit 18 to the Adelman Dec.), a fire occurred in 2001 at

the premises which housed defendants' documents, destroying the entire building and

most of the documents which were kept there.[5]

As held in Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933

F.2d 131, 138 (2nd Cir. 1991), personal liability is only imposed on stockholders where the

corporation is a "shell" being used to advance the individuals' own business:

> Under New York law it has been further held that
> when a corporation is used by an individual to accomplish his
> own and not the corporation's business, such a controlling
> shareholder may be held liable for the corporation's
> commercial dealings as well as for its negligent acts. Where
> there is proof that defendants were doing business in their
> individual capacities to suit their own ends-shuttling their own
> funds in and out without regard to the corporation's form-this
> sort of activity exceeds the limits of the privilege of doing
> business in a corporate form and warrants the imposition of

---

[4] Sylvia Robinson passed away on September 29, 2011. A Statement noting Ms.
Robinson's death has been filed (Docket No. 74).

[5] The fire and accompanying destruction of corporate documents explains why the
minute books were not available. Voluminous documents relating to income received by the
corporate  defendants were produced and the corporate defendants were deposed through their
officer Joseph Robinson, Jr. Therefore, this case is distinguishable from the decision cited by
plaintiff, Tuff-N-Rumble Management, Inc. v. Sugarhill Music Publishing, Inc., 2000 WL
274192 (S.D.N.Y.) at *5, where defendants "produced no documents and have refused to comply
with deposition notices directed to the corporate defendants."

22

> liability on individual stockholders.  The critical question is
> whether the corporation is a "shell" being used by the
> individual shareowners to advance their own "purely personal
> rather than corporate ends" (citations omitted).

There is absolutely no evidence that Sylvia and Joey Robinson, Jr. used the corporations

to advance their personal interests.  In addition, as held in Passalacqua, there are a number

of factors which a court must consider in determining whether to pierce the corporate

veil:

> (1) the absence of the formalities and paraphernalia that are
> part and parcel of the corporate existence, i.e., issuance of
> stock, election of directors, keeping of corporate records and
> the like, (2) inadequate capitalization, (3) whether funds are
> put in and taken out of the corporation for personal rather than
> corporate purposes, (4) overlap in ownership, officers,
> directors, and personnel, (5) common office space, address
> and telephone numbers of corporate entities, (6) the amount of
> business discretion displayed by the allegedly dominated
> corporation, (7) whether the related corporations deal with the
> dominated corporation at arms length, (8) whether the
> corporations are treated as independent profit centers, (9) the
> payment or guarantee of debts of the dominated corporation
> by other corporations in the group, and (10) whether the
> corporation in question had property that was used by other of
> the corporations as if it were its own.  Id. at 139.

As plaintiff does not even address, let alone establish, any of these factors other than

ownership, the individual defendants are entitled to summary judgment dismissing any

claims against them individually.

23

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for summary judgment should in all

respects be denied.

DATED: NEW YORK, NEW YORK
       DECEMBER 22, 2011

                  CINQUE & CINQUE, P. C.

                  By: _____
                    James P. Cinque (JPC-3673)
                  Attorneys for Defendants
                  845 Third Avenue, Suite 1400
                  New York, New York 10022
                  Telephone: (212) 759-5515
                  Telefax:   (212) 759-7737
                  Email:     CINQUE845@aol.com